FUENTES, P.J.A.D.
*306 A Middlesex County grand jury returned an indictment against defendant James Hemenway charging him with third degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) ; first degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1) ; fourth degree possession of marijuana, N.J.S.A. 2C:35-10(a)(3) ; and third degree possession of marijuana with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(11). The court denied defendant's motion to suppress physical evidence seized by the police from his apartment as well as statements defendant made to the police officers who arrested him outside of his apartment building.
Defendant thereafter entered into a negotiated agreement with the State through which he pled guilty to second degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(1). The State agreed to dismiss the remaining charges and recommend that the court sentence defendant to a term of eight years, with four years of parole ineligibility. Defendant preserved his right to appeal the denial of his motion to suppress. See R. 3:5-7(d). The court sentenced defendant to a *307 custodial term in accordance with the plea agreement, ordered the forfeiture of defendant's property seized at the time of his arrest, and imposed the mandatory fines and penalties.
In this appeal, defendant argues the court erred in denying his motion to suppress because the arresting officers seized the evidence found in his apartment without a warrant. After reviewing the record developed before the motion judge, we affirm. The police officers entered defendant's residence pursuant to a search warrant issued by the Family Part under the Prevention of Domestic Violence Act. When defendant refused to permit the officers entry into his residence to execute the search warrant, the officers lawfully arrested defendant for knowingly obstructing the effectuation of a judicial order pursuant to N.J.S.A. 2C:29-9(b)(1). Once lawfully inside the residence, the officers found in plain view illicit narcotics and *880 paraphernalia. This provided sufficient probable cause to sustain the search warrant subsequently issued by the Criminal Part.
We derive the following facts from the testimonial and documentary evidence presented at the suppression hearing.
I
On June 28, 2012, D.S.[1] filed a complaint against defendant under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, seeking a temporary restraining order (TRO). The complaint listed the following predicate offenses: assault, N.J.S.A. 2C:12-1, terroristic threats, N.J.S.A. 2C:12-3, criminal mischief, N.J.S.A. 2C:17-3, and criminal trespass, N.J.S.A. 2C:18-3, and identified "dating relationship" as the jurisdictional basis. Attached to the complaint was the following narrative statement of the incident that prompted D.S. to seek judicial relief:
6/27/12, [defendant] call via tel. argument ensued. [Defendant] appeared at [plaintiff's] apt unannounced, [defendant] broke into [plaintiff's] apt via the living room *308 window causing the air [ ] conditioner to fall & damage [the] apt, [defendant] subjected [plaintiff] to name calling, yelling foul, language, [defendant] pushed [plaintiff] & she fell & hit herself with the living room chair, [plaintiff's] mother entered the living room, [plaintiff's] mother tried to get [defendant] off of [plaintiff], [defendant] became enraged, [defendant] pushed [plaintiff's] mother, [defendant] then punched [plaintiff's] mother with a closed fist, [defendant] then scratched [plaintiff's] mother on her face, [plaintiff] attempted to push [defendant] off of her mother, [defendant] then began to strangle [plaintiff] by her throat, [plaintiff] pulled [defendant's] hair, [defendant] pushed [plaintiff] causing [plaintiff] to fall on the ground, [plaintiff's] mother attempted to call EPD but [defendant] hit her on the hand causing [plaintiff's] mother['s] cellphone to fall on the ground & [break], [defendant] said, "I'm going to kill you ! ! ! kill your mom, kill your dad & brother ! ! ! I'm going to get someone to throw [acid] on your face ! !" Shortly thereafter [defendant] left [plaintiff's] apt.
D.S. appeared before a Family Part judge in Union County that same day without counsel to testify at an ex parte hearing in support of her application for the TRO against defendant. The transcript of the TRO hearing reflects that D.S. testified with the assistance of an interpreter. The Family Part judge elicited the following testimonial evidence from D.S.:
THE COURT: Did you have a dating relationship at one time with [defendant]?
D.S.: Yes. For two years.
THE COURT: You say that on [June] 28th[,] which is today[,] at 10:30 a.m., you sa[w] [defendant] in front of a bank parking lot. Is that correct?
D.S.: Yes.
THE COURT: And there was some exchange of money. Is that right?
D.S.: Yes.
THE COURT: And then did he say to you, you will never see your mother again[;] I will kill her?
D.S.: Yes.
THE COURT: Did he say, I will destroy you and your family?
D.S.: Yes.
*881 THE COURT: Did he say, I will destroy your car?
D.S.: Yes.
THE COURT: And did he say he would cause you bodily harm?
D.S.: Yes.
THE COURT: On ... June 27th, which [was] yesterday, did you speak to him on the phone?
D.S.: Yes.
THE COURT: And then did he come to your apartment and come through the window?
*309 D.S.: He knocked down the air conditioner and came through the window.
THE COURT: Did he have permission to do that?
D.S.: No.
THE COURT: And then he pushed you, and you fell. Is that right?
D.S.: Yes.
THE COURT: Okay. And your complaint has more details. You have a child with [defendant]?
D.S.: No.
THE COURT: Okay ... [D]o you have [an] awareness that he has any weapons?
D.S.: Yes.
THE COURT: What kind of weapons do you claim he has?
D.S.: Handguns, knives.
THE COURT: A handgun?
D.S.: Knives, blades.
THE COURT: Handguns?
D.S.: Switchblades.
THE COURT: Knives?
D.S.: Switchblades.
THE COURT: Where does he have these?
D.S.: Special compartments in his car and at his apartment.
THE COURT: What kind of car does he have?
D.S.: Honda Pilot.
THE COURT: A Honda-Honda Hybrid?
D.S.: Pilot. Pilot.
THE COURT: Pilot?
THE INTERPRETER: P-I-L-O-T.
Based on D.S.'s testimony, the Family Part found sufficient evidence to issue a TRO against defendant pursuant to N.J.S.A. 2C:25-28(g). As authorized by N.J.S.A. 2C:25-28(j), the TRO included a provision "prohibit[ing] ... [defendant] from possessing any and all firearms or other weapons" and authorized the police officers to search for and seize any "handguns, knives [and] switchblades." D.S. provided the Family Part with defendant's home address and the make, model, and color of each of his three vehicles. The TRO expressly authorized the police officers to search defendant's residence and vehicles and seize any weapons found therein.
*310 On June 29, 2012, Old Bridge Police Officers Brandon Ward and Edward Riporti were instructed to serve defendant with the TRO and search warrant at his residence between the hours of 5:30 p.m. and 7:30 p.m. The officers knocked on the door of defendant's residence, but no one answered. Ward recognized the Honda Pilot and Honda Accord described in the search warrant parked near the apartment complex where defendant resided. He also detected an odor of marijuana emanating from the vicinity of defendant's apartment, but was unable to pinpoint its source. The officers decided to leave and return later before the end of their shift.
Several hours later, defendant's attorney contacted the Old Bridge Police Department and advised the dispatcher that defendant was aware of the TRO and intended *882 to voluntarily go to the police station to accept service. Ward told the police dispatcher that he planned to return to defendant's residence as soon as possible because the judge who issued the TRO and search warrant directed the officers to serve defendant at his place of residence, not at a neutral location. Ward then contacted Riporti, who was closer to defendant's residence, and instructed him not to permit anyone to enter or leave defendant's apartment.
When Ward arrived at defendant's residence shortly thereafter, he found defendant speaking with Riporti on the sidewalk in front of the building. According to Ward, as he approached, he heard defendant saying to Riporti: "I guess she lied again[.] ... [G]ive me whatever ... I have to sign[.] ... [S]he gets jealous, makes stuff up; I kind of expected this." Ripoli had not served defendant with the TRO and search warrant because Ward was the only one in possession of these documents.
Ward told defendant that he and Riporti were there to serve him with a domestic violence TRO and a warrant to search his apartment and seize any firearms or other weapons found therein. According to Ward, defendant stated: "I'm not going in my apartment. My attorney said not to let anybody in the apartment." Ward testified that he explained to defendant that "at this point it was not a choice; it was an order issued by a judge and I was *311 required by law to make entry into the apartment to search for the weapons and go over and serve him with the order."
Defendant removed a cellphone from his pocket and informed the officers he was calling his attorney. Ward then took the following action:
I removed [the] cellphone from [defendant's] hand for our safety; I did not know who he was calling. I told him this ... had nothing to do at this point with his attorney. There was an order issued by a judge and for our safety we were not allowing him to make any phone calls so as to alert anybody, possibly bring anybody else to the scene. At this point it was a moot issue; we had to make entry into the apartment.
Undaunted, defendant removed another cellphone from his pocket and again advised the officers he was calling his attorney. Ward described defendant's demeanor at this point as "more agitated." Ward removed the second cellphone from defendant's hand and "explained again it was a judicial order, any failure to comply with the order or allow us to search would result in him being placed under arrest[.]" Ward testified that defendant responded: "You're not going into the apartment[;] arrest me[.]"
The officers arrested defendant.[2] Before entering the apartment, Ward asked defendant if there was anyone else inside his apartment. Defendant "shrugged his shoulders" and stated: "I don't know." The officers used the key they seized from defendant to enter a "common vestibule area" of the building. Ward testified that upon entering this area of the building, "[we] were hit with a distinctly strong odor of raw marijuana." However, they were not able to pinpoint its location at the time.
Old Bridge Police Sergeant Brian Smalley arrived at the scene to assist Ward in *883 searching defendant's apartment; Riporti remained *312 with defendant.[3] Once they opened the "main door" of defendant's apartment, Ward testified "the smell became much more distinct and there were multiple opened air fresheners all over the stairway ascending up into the apartment." Ward also saw air fresheners at the bottom of the steps. Ward testified the air fresheners were "scattered ... as we made our entryway up into the stairway. As we ascended the stairs, there were more placed throughout the stairs and in the living room ... and dining [room]."
The officers conducted a room-by-room search of the apartment to confirm there were no other occupants. As they walked through the apartment, Ward noticed more air fresheners in the living room and "a Mason jar almost [filled] with what appeared to be marijuana sitting on a small computer table near the window[.]" In the bathroom, Ward discovered a transparent "freezer-style bag" of suspected cocaine on the floor in front of the toilet. Using defendant's keys, the officers opened a locked closet in the living room; inside the closet was a large gun safe. After "clearing" the apartment, the officers suspended their search for weapons and waited for a detective to respond to the scene to apply for a telephonic search warrant for narcotics. The officers also called a tow truck to impound defendant's vehicles.
Detective Robert Mazalewski arrived at defendant's apartment approximately fifteen to thirty minutes later. He took photographs of the condition of the contraband and the location where it was found in defendant's apartment. Mazalewski returned to the police station to apply for a telephonic search warrant. He testified that his role in the investigation "was strictly in an ID capacity to photograph what the officers had seen."
*313 At a telephonic hearing held at 1:30 a.m. on June 30, 2012, Detective Mazalewski testified to a judge to obtain a warrant to search defendant's apartment for the presence of illicit narcotics and other related contraband. Mazalewski described to the judge the circumstances that led Old Bridge Police Officers to enter and search defendant's apartment pursuant to a TRO and search warrant issued by the Family Part. After considering the evidence, the judge made the following findings:
Based on the testimony of the Detective, it is clear that upon executing the domestic violence search warrant that upon entering the house, pursuant to the search warrant that drugs were observed as well as an odor smell that would indicate the presence of marijuana which certainly gives the officers cause to believe that there may be additional drug paraphernalia or other materials relating to drugs in the apartment.
And the fact that a strong odor of marijuana is emanating from two safes in a closet, certainly gives the officers probable cause to open and use whatever force is necessary as to the particular safes. And in view of the extent of the drugs that are believed to exist in the premises, it certainly would be appropriate and probable cause has been established to search the cars that are registered or believed to be registered in the name of [defendant] and certainly were located at [defendant's] residence.
So I think all of the facts testified to[ ] by the Detectives certainly gives more than sufficient probable cause to search *884 the cars, the residence[,] as well as do whatever is necessary to search the two space[s].
Detective Mazalewski contacted the officers who had remained at defendant's apartment and advised them they could begin searching the residence for illicit narcotics and related contraband. Through this search, the officers found cocaine and drug paraphernalia, and five hollow-point .38 caliber bullets in one of the gun safes.
On July 2, 2012, law enforcement agents executed the telephonic search warrant with respect to defendant's two automobiles, a Honda Pilot and Honda Accord.[4] Old Bridge Police Detective Joseph Gaugeon testified at the suppression hearing that the officers used "a gun dog and a narcotics dog to narrow down [the] search of the vehicle." The police found $20,000 and a large bag of *314 marijuana concealed behind the passenger air bag of the Honda Pilot and $72,000 "in a trap between the seats under the console" of the Honda Accord. The police officers who searched defendant's residence and motor vehicles did not find any weapons matching the description provided by Suarez at the TRO hearing on June 28, 2012.
II
On July 11, 2012, the Family Part conducted a hearing to determine whether D.S. was entitled to a final restraining order (FRO) under the PDVA. D.S. appeared pro se and was provided with an interpreter. Defendant was represented by private counsel. At the start of the hearing, the judge noted that the FRO hearing was originally scheduled for July 5, 2012, but it was adjourned at the request of defendant's counsel to allow defendant to obtain the transcript of the June 28, 2012 TRO hearing.
Before taking any testimony, the judge asked the parties if they were "prepared to go forward." Both sides responded affirmatively. The judge then asked defense counsel: "Does the defense dispute that [defendant] and [D.S.] were in a dating relationship?" Counsel responded: "We do." The following colloquy captured how the judge addressed this issue.
THE COURT: I'll accept an attorney proffer for purposes of now. What is the defense's position?
DEFENSE COUNSEL: Defense's position is that this woman is married to another man. My client resides most of the time in Florida. He has rental properties up here in New Jersey that he tends to. And what Your Honor is going to find out is that [D.S.] was minding a safe deposit box that had monies that belonged to [defendant]. And what led to the severance of that relationship, which was not a dating relationship, is that [defendant] wanted the money.
....
[Defendant] wanted the money and that incident supposedly occurred on June 28, 2012. He denies that he was in a dating relationship with her. She's married to another man.
THE COURT: Well, just because she's married to another man of course, Counsel, doesn't necessarily negate the possibility that they had a romantic relationship, correct?
DEFENSE COUNSEL: That's true.
*315 THE COURT: So ... your client's taking the position that there was no amorous, romantic, or intimate relationship between himself and [D.S.]?
DEFENSE COUNSEL: That ... won't be provable. Yes.
*885 The record shows the FRO judge did not ask D.S. whether she understood the jurisdictional implications under the PDVA of defense counsel's proffer. The judge simply swore in D.S. and asked her, "what criminal offenses are you identifying with regard to [defendant's] conduct?" Given the complex nature of the judge's question, D.S.'s response was understandably nonresponsive. After the judge rephrased the question, D.S. testified that defendant forced himself into her home through the window, having broken the air conditioner. D.S. ultimately testified that defendant had criminally trespassed into her apartment, committed criminal mischief by breaking and damaging her furniture, and threatened "to put acid on [her] face," and kill her and members of her family.
After he identified the predicate offenses at issue, the judge addressed defense counsel directly to confirm that he had prior notice of these offenses and was prepared "to mount a defense to those very charges." Defense counsel confirmed he was aware of the offenses recited in the domestic violence complaint and the supplemental typewritten statement attached thereto. The judge then addressed D.S. directly as follows:
THE COURT: [D.S.], let me tell you how this proceeding will take place. The burden of proof for the issuance of ... a final restraining order rests on the plaintiff. On you, the movant, the person who seeks the protection. Do you understand that?
D.S.: Does that mean that it doesn't include my family?
THE COURT: Ma'am, I am talking about what your legal obligations are in terms of who has the burden of proof. Do you understand that?
D.S.: Yes.
THE COURT: The Prevention of Domestic Violence Act requires a plaintiff to prove by a preponderance of the evidence that a restraining order must [be] issue[d]. Do you understand that?
D.S.: I understand.
THE COURT: I will be asking you to put forward your case-in-chief, your proofs. You may testify on your own behalf, for example, under oath. You may call additional witnesses to testify on your behalf who have personal knowledge. You may seek to admit exhibits; documents, perhaps text messages and the like in support of your claim. Do you understand that?
*316 D.S.: I understand.
THE COURT: In addition, you will be subject perhaps to cross-examination by [defendant's] lawyer. Do you understand that?
D.S.: (In English) I understand them.
THE COURT: The defense may also present evidence in its own case-in-chief. But that, of course, does not modify the overriding burden of proof which is only and always on the plaintiff. Do you understand that?
D.S.: I understand.
THE COURT: The [c]ourt will have to determine pursuant to [ Silver v. Silver, 387 N.J. Super. 112, 903 A.2d 446 (App. Div. 2006) ] whether a-one or more predicate acts were committed by the defendant and whether a final restraining order is necessary to protect the plaintiff from immediate danger or further acts of domestic violence.
We are doubtful that a lay litigant seeking the protection of the court in a domestic violence hearing can meaningfully comprehend this explanation. The judge's use of technical terms such as "cross-examination", "case-in-chief," "preponderance of the evidence," and his citation to Silver to determine whether "one or more predicate acts were committed" made this "explanation"
*886 needlessly dense, ultimately reducing the experience to a mere perfunctory exercise. Of particular concern in light of defense counsel's proffer expressly challenging the court's subject matter jurisdiction, is the judge's failure to apprise D.S. that she was required to present evidence showing she and defendant had a "dating relationship" before June 28, 2012.
The record also shows that D.S.'s presentation of the evidence was hampered not only by her unfamiliarity with the rules of evidence and trial procedures, but by the court-assigned interpreter's inability to simultaneously interpret both D.S.'s questions and her mother's answers while testifying as a fact witness. The interpreter announced this difficulty at the start of her mother's testimony:
INTERPRETER: Your Honor, your Honor, we're going to have a problem if I'm not going to be able to interpret for your Honor and the record what is being asked and answered.
THE COURT: True.
INTERPRETER: Now you tell me, your Honor, what you want me to do.
*317 THE COURT: Well, we're going to be at this for a long time, I predict, and so I'm going to ask everybody-everybody to relax. We're going to get through this.
[D.S.], the interpreter is correct. She has a difficult job, and that is she has to translate for you, for the Spanish-speaking witness, and then translate for me back into English. Understood?
The record shows D.S. asked her mother a number of times whether she knew that she and defendant were "boyfriend and girlfriend." Defense counsel objected each time arguing the questions were phrased as leading questions. The judge sustained the objections each time. At one point, however, the judge addressed D.S. directly in an effort to explain to her the proper way to phrase the question:
THE COURT: The correct way to ask the question is [D.S.] do you know [defendant]? And if the answer to that is, as we presume, yes; how do you know [defendant]? That is a non-leading method to get at the same answer, presumably.
And forgive me for interceding, Counsel, but I have a, as you know, an extremely congested docket.
DEFENSE COUNSEL: I understand. I don't mean to slow this down any[ ]more than necessary.
THE COURT: ... I'm not interpreting that you are.
DEFENSE COUNSEL: All right. Thank you.
THE COURT: [D.S.], you may not ask leading questions of witnesses on direct-examination.
D.S.: I'm sorry.
THE COURT: Even though you are a lay [ ] person representing yourself, which you're entitled to, there are rules of evidence and trial procedure which are applicable to everyone, lawyer and non-lawyer alike, and you must abide by them. Do you seek an adjournment to retain your own lawyer?
D.S.: No. I don't want to.
D.S. resumed her direct examination of her mother, but did not return to the issue of her relationship with defendant. The judge continued to sustain defense counsel's objections based on the leading nature of D.S.'s questions. In fact, in sustaining counsel's objections, the judge at one point sua sponte ruled that D.S.'s question "[a]lso assumes facts not in evidence." Because the mother did not speak English and defendant did not speak Spanish, the judge ultimately struck most of the mother's testimony describing defendant's *887 threats and other statements to her and her daughter. *318 When D.S. took the stand to testify on her own behalf, the judge gave the following instructions:
You are not going to be asked questions by the [c]ourt. You are going to have to testify on your own behalf as to the incidents or incident which you are alleging and any prior history of domestic violence. You will then be subject to cross-examination.
Once again, we note the judge's failure to admonish D.S. that this was her opportunity to testify or present any evidence about her relationship with defendant, which was the threshold, dispositive issue defense counsel identified before the start of the FRO hearing.
Consistent with the judge's instructions, D.S. testified about the June 28, 2012 incident that caused her to seek the judicial protection available under the PDVA. Although D.S. did not directly characterize the nature of her relationship with defendant, her description of her encounter with defendant included the following facts:
That morning we met in front of the bank and his behavior was apparently normal at the beginning. I gave him clothing that he had in my apartment; shoes, underwear, personal stuff. I gave him the money that I had, but I made him sign a piece of paper so that there would be proof that I had given him what he had given me to save for him.
[ (Emphasis added).]
At the conclusion of D.S.'s relatively brief direct testimony, the judge recessed the proceedings for a few minutes. When the hearing reconvened, defense counsel declined to cross-examine D.S. and instead moved to dismiss the complaint for lack of subject matter jurisdiction. Defense counsel argued that D.S.'s testimony only described "the arrangement that I proffered to the [c]ourt about giving back money that she was minding for him." The judge granted the motion. In support of this ruling, the judge stated:
There is no evidence in the record indicating that you are a spouse or a former spouse of the defendant. There is no evidence that you had a child with the defendant or that you are pregnant with a child from the defendant. There is no testimony that you are a person who is presently or formerly in the same household as the defendant. And, lastly, aside from the assertion in the complaint, *319 there is no testimony, and surely no credible testimony that you are or were in a dating relationship with the defendant.
[ (Emphasis added).]
The judge held that as a plaintiff seeking relief under the PDVA, D.S. was on "constructive notice" of the need to establish subject matter jurisdiction. The judge also found that D.S. had actual notice of the need to establish a dating relationship between herself and defendant. The judge noted it would have been "improper for the [c]ourt to spoon[-]feed either a plaintiff or a defendant."
III
Against this procedural backdrop, we now return to defendant's motion to suppress before the Criminal Part. The motion judge found the Family Part properly issued a TRO and search warrant pursuant to the PDVA on June 28, 2012. Although the Family Part subsequently found there was insufficient credible evidence to conclude D.S. and defendant ever had a dating relationship, such a finding did not retroactively impugn the validity of the search warrant. Given the evidence presented at this threshold ex parte hearing, the Family Part reasonably concluded a TRO was *888 "necessary" to protect D.S.'s "life, health or well-being" in accordance with N.J.S.A. 2C:25-28(f).
The Criminal Part also found that defendant's refusal to permit the police officers' entry into his apartment, in direct contravention of the domestic violence search warrant, provided the officers with sufficient probable cause to believe defendant was obstructing justice. The judge concluded that defendant's arrest and the incidental search of his person that permitted the officers to seize the keys to his apartment was entirely proper. Indeed, the motion judge found that pursuant to our State's well-established knock-and-announce jurisprudence, the search warrant authorized the officers to enter defendant's residence by force if necessary. Once the officers lawfully entered defendant's residence in accordance *320 with the warrant, the judge found the contraband they discovered was admissible under the plain view doctrine.
Notwithstanding the lack of exigent circumstances, the motion judge found the telephonic search warrant was "procedurally sound." Although the State established probable cause to search defendant's residence and gun safes, the judge disagreed with the telephonic judge's finding of probable cause to search defendant's vehicles. However, the motion judge found the absence of probable cause to search defendant's vehicles for narcotics was "not necessarily fatal to the State's case[.]" The police officers were authorized, indeed duty bound, to execute the domestic violence search warrant by searching defendant's cars for weapons.
The Criminal Part denied defendant's motion to cross-examine the affiants who testified in support of the civil and criminal search warrant applications. Because D.S. is "not a law enforcement officer[,]" her alleged misrepresentations to the Family Part as a "private citizen complainant rendered the concerns in " Franks [5] and its progeny" inapplicable. The same principles also insulated Detective Mazalewski's testimony before the telephonic judge.
Finally, the Criminal Part denied the motion to suppress the incriminating statements defendant made to Officers Ward and Riporti outside of his apartment building. Citing State v. Dispoto, 383 N.J. Super. 205, 891 A.2d 633 (App. Div. 2006), the motion judge found defendant was not in custody when the officers attempted to serve him with the TRO and search warrant. Accordingly, the officers were not required to apprise defendant of his rights under Miranda.[6]
IV
Against this backdrop, defendant raises the following arguments:
*321 POINT I
The judgment of conviction should be reversed because the trial court erroneously denied Mr. Hemenway's motion to suppress evidence seized without a warrant.
A. The temporary restraining order and domestic violence search warrant were invalid, as they [were] issued based upon admitted falsehoods, and as a result, all evidence derived seized without a warrant therefrom must be suppressed.
B. Mr. Hemenway's arrest for obstruction of justice was unlawful and all evidence seized from Mr. Hemenway's person and all evidence seized *889 after his illegal arrest must be suppressed.
C. The first warrantless search of Mr. Hemenway's residence was a pretext for a narcotics search and exceeded the scope of the domestic violence search warrant and all evidence unlawfully seized therefrom must be suppressed.
D. The second warrantless search of Mr. Hemenway's residence was unlawful as this search was not justified by any exception to the warrant requirement. The State admitted during final oral argument to the trial court that this search was illegal, and therefore, all evidence obtained during this warrantless search and all evidence obtained thereafter must be suppressed.
POINT II
The judgment of conviction should be reversed because the trial court erroneously denied Mr. Hemenway's motion to suppress evidence seized with a warrant.
A. The search warrants were fruits of the poisonous tree and therefore were invalid and illegally issued and any evidence derived therefrom must be suppressed.
B. There was no probable cause for the search warrant of the residence or of the two (2) motor vehicles. The trial court found no probable cause for the search warrants for the motor vehicles.
C. The trial court erred in denying Mr. Hemenway's application for a Franks v. Delaware [hearing], as the temporary restraining order and domestic violence search warrant applications contained reckless misrepresentations and material omissions.
D. The trial court erred in denying Mr. Hemenway's application for a Franks v. Delaware hearing, as the telephonic search warrant application contained reckless misrepresentations and material omissions.
E. The trial court erroneously applied the independent source doctrine sua sponte and relied on this doctrine which was not applicable in this case, and therefore, any and all evidence unlawfully seized as a result of the defective search warrant and unlawful warrantless searches should be suppressed.
POINT III
The judgment of conviction should be reversed because the trial court erroneously denied Mr. Hemenway's motion to suppress statements made at the scene in violation of the Fourth [sic] Amendment and Article I, Paragraph 7 of the New Jersey Constitution [sic].
We reject these arguments and affirm. The record we have described at length here demonstrates that the evidence against *322 defendant was gathered by the State consistent with the privacy and due process protections guaranteed by our federal and State Constitutions. However, before addressing the substantive merit of defendant's arguments, we will first reaffirm the relevant standard of review.
We are bound to uphold the factual findings made by the Criminal Part judge in support of his ruling denying defendant's motion to suppress, provided they are "supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424, 95 A.3d 188 (2014). Thus, we can disturb or reject the judge's findings of fact "only if they are so clearly mistaken that the interests of justice demand intervention and correction." State v. Elders, 192 N.J. 224, 244, 927 A.2d 1250 (2007) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964) ). This deferential standard of review is predicated on *890 the notion that factual findings are substantially influenced by the motion judge's opportunity to " 'hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.' " State v. Robinson, 200 N.J. 1, 15, 974 A.2d 1057 (2009) (quoting Elders, 192 N.J. at 244, 927 A.2d 1250 ).
A search executed pursuant to a warrant issued by a court carries a presumption of validity, State v. Valencia, 93 N.J. 126, 133, 459 A.2d 1149 (1983) ; we must also accord substantial deference to the trial judge's decision to issue such a warrant. State v. Sullivan, 169 N.J. 204, 211, 777 A.2d 60 (2001). In determining whether there is probable cause to issue a search warrant, a judge "must consider the totality of the circumstances, without focusing exclusively on any one factor[.]" Id. at 216, 777 A.2d 60. Ordinarily, a warrant application is legally sufficient provided the factual assertions contained therein would lead a prudent person to believe a crime has been committed and evidence of criminality will be found at the specified location. Id. at 217, 777 A.2d 60. We review de novo the motion judge's legal conclusions. State v. Gandhi, 201 N.J. 161, 176, 989 A.2d 256 (2010).
*323 Here, it is undisputed that the evidence that established probable cause for the search warrant issued by the Criminal Part judge was inextricably connected to the TRO issued by the Family Part to protect D.S. under the PDVA. The PDVA defines a "[v]ictim of domestic violence" as:
any person who is 18 years of age or older or who is an emancipated minor and who has been subjected to domestic violence by a spouse, former spouse, or any other person who is a present household member or was at any time a household member. "Victim of domestic violence" also includes any person, regardless of age, who has been subjected to domestic violence by a person with whom the victim has a child in common, or with whom the victim anticipates having a child in common, if one of the parties is pregnant. "Victim of domestic violence" also includes any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship.
[ N.J.S.A. 2C:25-19(d) (emphasis added).]
Based on the allegations D.S. made in the domestic violence complaint filed on June 28, 2012, the Family Part judge properly conducted an ex parte hearing pursuant to N.J.S.A. 2C:25-28(f). The testimonial evidence D.S. provided at this hearing established "good cause" for the issuance of emergency ex parte relief in the form of a TRO. N.J.S.A. 2C:25-28(i) ; R. 5:7A. The TRO may also include a provision
forbidding the defendant from possessing any firearm or other weapon enumerated in subsection r. of [N.J.S.A.] 2C:39-1, ordering the search for and seizure of any firearm or other weapon at any location where the judge has reasonable cause to believe the weapon is located and the seizure of any firearms purchaser identification card or permit to purchase a handgun issued to the defendant and any other appropriate relief.
The judge shall state with specificity the reasons for and scope of any search and seizure authorized by the order.
....
[ N.J.S.A. 2C:25-28(j).]
Here, D.S. testified at the TRO hearing that defendant possessed a variety of weapons including knives, switchblades, and guns. The judge thus included a provision in the TRO under N.J.S.A. 2C:25-28(j) that directed the police officers to search defendant's residence and seize any firearms found therein. The judge did not *891 "state with specificity the reasons for and scope of any search and seizure authorized by the order." *324 In this appeal, defendant collaterally attacks the propriety of the TRO search warrant. Defendant argues D.S. misrepresented her relationship with defendant as involving a "dating relationship" to improperly obtain relief under the PDVA. Defendant emphasizes that the TRO judge failed to challenge D.S.'s credibility at the ex parte hearing and merely accepted her "conclusory allegations" by asking her a series of "leading questions based on the written complaint that was apparently prepared by [c]ourt staff."
Finally, defendant argues that N.J.S.A. 2C:25-28(j) is facially unconstitutional because it allows the Family Part to issue a search warrant based only on a finding of "reasonable cause." According to defendant, this lower statutory standard impermissibly conflicts with the Fourth Amendment to the United States Constitution, which requires a showing of probable cause to justify a search warrant of a person's home. Defendant bases this argument on Justice Albin's dissent in State v. Harris, 211 N.J. 566, 50 A.3d 15 (2012), which was also joined by Justice LaVecchia, in which he maintained that:
As written, the Domestic Violence Act permits the search of a home for weapons, even in the absence of exigent circumstances or some other well-recognized exception to the Constitution's warrant requirement, based on a warrant issued without a judicial finding of probable cause. See [N.J.S.A.] 2C:25-28(j). Relying on the Act, the family court in this case issued a warrant for the search for weapons in defendant's home-without a finding of probable cause or a finding that would have excused non-compliance with the dictates of the Fourth Amendment. The United States Supreme Court has never suggested-even remotely-that the special-needs doctrine would justify a home search in circumstances such as presented here.
[ Id. at 593, 50 A.3d 15 (Albin, J., dissenting).]
We begin our analysis of this issue by emphasizing that as an intermediate appellate court, we are only bound to follow the decisions of the Supreme Court. A dissenting opinion authored by a minority of the Justices in a case, no matter how well-reasoned we think it may be, does not constitute binding precedent. In Harris, the majority of the Court declined to respond directly to the concerns raised by the dissenting Justices because they had "not [been] raised by any of the parties at this point in this *325 litigation." Id. at 592, 50 A.3d 15. We are thus free to address the issue defendant has raised here and express our views on the matter. However, it is a matter of settled policy that a court should "avoid reaching constitutional questions unless required to do so." State v. Ingram, 230 N.J. 190, 202, 165 A.3d 797 (2017) (quoting Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells, 204 N.J. 79, 95, 7 A.3d 720 (2010) ). We are satisfied that this appeal can be decided without reaching this constitutional dilemma.
In adopting the PDVA, the Legislature found and declared
that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and *892 child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.
[ N.J.S.A. 2C:25-18 (emphasis added).]
To enforce this public policy, the Legislature emphatically made clear
that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim. Further, it is the responsibility of the courts to protect victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions, and by ordering those remedies and sanctions that are available to assure the safety of the victims and the public.
[Ibid. ]
The Supreme Court has "liberally construed" the PDVA to achieve these purposes. In re F.M., 225 N.J. 487, 509, 139 A.3d 67 (2016) (citing Cesare v. Cesare, 154 N.J. 394, 400, 713 A.2d 390 (1998) ). As codified by the Court in Rule 5:7A, a plaintiff seeking domestic violence emergency relief must testify in person before the Family Part judge or submit a sworn complaint setting forth her allegations. In order to justify the Family Part's issuance of a search warrant, a plaintiff must establish: (1) probable cause to *326 believe the defendant has committed an act of domestic violence; (2) reasonable cause to believe the place identified in the warrant contains a qualifying weapon under N.J.S.A. 2C:39-1(r) ; and (3) reason to believe a defendant's access to the weapon poses a "heightened risk of injury." See N.J.S.A. 2C:25-28(j) ; State v. Dispoto, 189 N.J. 108, 120-21, 913 A.2d 791 (2007) ; State v. Cassidy, 179 N.J. 150, 164, 843 A.2d 1132 (2004).
When a Family Part judge orders emergent relief, he or she is required to "state with specificity the reasons for and scope of any search and seizure authorized by the order." N.J.S.A. 2C:25-28(j). The PDVA directs that any ex parte order "shall immediately be forwarded to the appropriate law enforcement agency" and shall "immediately be served upon the defendant[.]" N.J.S.A. 2C:25-28(l). Furthermore, any restraining order issued pursuant to the PDVA "shall be in effect throughout the State, and shall be enforced by all law enforcement officers." N.J.S.A. 2C:25-28(p).
We have described "reasonable cause" as "a more relaxed standard than probable cause[,]" and as "akin to 'reasonable suspicion[.]' " State v. Perkins, 358 N.J. Super. 151, 159, 817 A.2d 364 (App. Div. 2003) (citing State v. Arthur, 149 N.J. 1, 8, 691 A.2d 808 (1997) ). To establish reasonable cause, a police officer "must be able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.' " Id. at 160, 817 A.2d 364 (alteration in original) (quoting State v. Citarella, 154 N.J. 272, 278, 712 A.2d 1096 (1998) ).
In Dispoto, the Court held that "[t]o sustain the validity of the domestic violence search warrant that issued against [the] defendant, probable cause must have existed to believe that [the] defendant committed the offense of terroristic threats. Specifically, there must have been probable cause to believe that defendant made a threat against his wife." Dispoto, 189 N.J. at 122, 913 A.2d 791. Here, the domestic violence complaint D.S. filed against defendant and her sworn testimony before the Family Part judge in support *893 of her application for a TRO is consistent with the *327 violent encounter she described in a typewritten statement attached to her domestic violence complaint.
The Court's discussion in Cassidy is particularly relevant here. We will briefly recite the salient facts of Cassidy to provide context to our analysis. At the urging of her friends, the victim of domestic violence reported the alleged incident of domestic violence to the police one month after the incident allegedly occurred. Cassidy, 179 N.J. at 154, 843 A.2d 1132. The police officer who responded "telephoned the municipal court judge to seek a TRO on an ex parte basis." Id. at 155, 843 A.2d 1132. The judge "spoke" to both the victim and the police officer, but did not swear-in either one, as required under N.J.R.E. 603. Ibid. The judge did not record his "conversation" with these two putative witnesses. Ibid. Despite these deficiencies, the judge found "probable cause" to issue an ex parte TRO under the PDVA and instructed the police officer "to fill out the pre-prepared form order for a TRO and authorized the police to search for and seize weapons." Ibid.
The Court in Cassidy noted "that the warrant portion of the TRO" was completed by the police officer "at the judge's instruction[.]" Ibid. The warrant contained "a check-off at the line" that directed the defendant "to turn over all weapons and permits to carry firearms." Ibid. The police officer
added language specifying the weapons as shotguns, pistols, and rifles. The record is unclear whether the judge specifically instructed [the police officer] to add that language. Finally, the judge authorized execution of the TRO that night ... Simultaneously, the judge issued a domestic violence complaint against defendant.
[ Ibid. ]
Although the Cassidy Court acknowledged that the PDVA authorizes a judge to issue a TRO without the applicant being physically present at the court, it emphasized that such relief must be supported by "sworn testimony or complaint of an applicant who is not physically present, pursuant to court rules." Id. at 158, 843 A.2d 1132 (quoting N.J.S.A. 2C:25-28(h) ). In light of this material deviation from the requirements of the PDVA, the Court held that "although the warrant to search [the] defendant's home arose in the context of a domestic violence restraining order, for *328 all intents and purposes it is a telephonic warrant and for purposes of a criminal prosecution must be judged by those standards." Id. at 159, 843 A.2d 1132.
The material facts here stand in sharp contrast to the ad hoc approach the Court found wanting in Cassidy. D.S. completed and filed the domestic violence complaint against defendant on June 28, 2012, the day after the violent incident. The complaint contains her sworn statement describing defendant's violent invasion of her home as well as the altercation that ensued after defendant forced himself through the window, causing the air conditioner to fall to the ground. Once inside, defendant physically assaulted her and her mother, and threatened to mutilate D.S.'s face with acid.
D.S. testified under oath before the Family Part judge who issued the TRO. This testimonial evidence provided specific evidence to substantiate the predicate offenses identified in the domestic violence complaint. D.S. also described under oath the various weapons defendant had in his possession, including a handgun, a knife, and a switchblade. D.S. also provided defendant's home address and identified three motor vehicles defendant owned or *894 had access to, that had hidden compartments to store weapons.
Officer Ward testified that defendant's counsel was aware of the TRO and instructed defendant to report to the police station to accept service. Ward responded to defendant's residence as directed by the Family Part to serve defendant and execute the search warrant. Despite the officers' attempt to execute a facially valid warrant, defendant refused to permit the officers to enter his apartment. The Criminal Part judge found Officer Ward's testimony concerning these events credible.
In this light, we note the following admonition the Court made in Cassidy:
It goes without saying that although failure to meet the technical and substantive requirements for a restraining order results in an invalid order, the order nonetheless has legal effect until vacated.
....
*329 Thus, even if an ex parte domestic violence TRO is issued pursuant to a flawed process, the person intended to be protected must receive the benefits of the order. A defendant must comply with the TRO's restraints and any search and seizure order contained therein, if only to challenge the validity of its respective parts in an appropriate forum later. In respect of the restraints, a defendant may obtain relief from the TRO under an expedited process set forth in the Act.
[ Cassidy, 179 N.J. at 159 n.3, 843 A.2d 1132 (citations omitted) (emphasis added).]
Thus, the subsequent dismissal of the domestic violence complaint at the FRO hearing did not ex post facto vitiate the validity of the search warrant the Family Part issued under N.J.S.A. 2C:25-28(j). Defendant's failure to comply with the police officers' direct instruction to allow them entry into his residence to execute a facially valid TRO and search warrant gave the officers probable cause to arrest defendant on the charge of fourth degree contempt under N.J.S.A. 2C:29-9(b)(1). Once inside his apartment, the officers immediately detected the strong odor of raw marijuana and saw in plain view multiple air fresheners located throughout the apartment to mask the scent. The record also shows that before entering the apartment, the officers asked defendant whether anyone else was inside. Defendant responded with a shrug of his shoulders and stated he did not know. Given defendant's non-cooperation and mindful of the allegations concerning the presence of weapons, once lawfully inside the apartment, the officers conducted "a protective sweep," limited to areas where a person could be hiding and to "ferret out weapons" that might be used against them. State v. Davila, 203 N.J. 97, 125-129, 999 A.2d 1116 (2010).
Defendant's remaining arguments concerning the admissibility of certain statements he made to Officer Riporti while awaiting the arrival of Officer Ward were legally inconsequential because defendant was not in a custodial setting at the time. Although Ward told defendant he could not accept service of the TRO at the police station, this did not imply he was not free to leave. Furthermore, we would reach the same conclusion even if we were to conclude that a reasonable person under defendant's circumstances would believe he was not free to leave. According to Ward, as he approached Riporti, he overheard defendant saying: "I guess *330 she lied again[.] ... [G]ive me whatever ... I have to sign[.] ... [S]he gets jealous, makes stuff up; I kind of expected this." These statements are not facially incriminatory to the criminal charges in the indictment. Their relevancy, if any, *895 would be to establish the existence of a romantic relationship between D.S. and defendant. This implicates only the subject matter jurisdiction of the Family Part.
Affirmed.

Pursuant to Rule 1:38-3(c)(12), we use initials to protect the confidentiality of a victim of domestic violence.

Defendant was not physically served with the TRO until 6:30 a.m. on June 30, 2012. In a complaint and summons, Ward charged defendant with fourth degree contempt under N.J.S.A. 2C:29-9(b)(1). He certified that defendant "purposely or knowingly" violated an order entered under the PDVA "by impeding the effectuation of the order [and] refusing to allow officers access into his apartment to search for multiple weapons as stipulated in the order."

At one point, defendant complained of chest pain and difficulty breathing. A first aid squad responded and transported him to a nearby hospital. Defendant remained in custody while he was medically evaluated and treated at the hospital.

The police did not locate the Toyota Sienna D.S. described in the TRO hearing.

Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).